UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JAMES BERTRAND, *et al.*,

          Plaintiffs,                  9:14-CV-1456 (GTS/DEP)
                                          (LEAD CASE)

v.

CRAIG DEMMON, *et al.*,

          Defendants.
_____

JAMEL WEAVER, *et al.*,

          Plaintiffs,                  9:15-CV-0403 (GTS/DEP)
                                          (MEMBER CASE)

v.

CRAIG DEMMON, *et al.*,

          Defendants.
_____

SHANE GORDON, *et al.*,

          Plaintiffs,                  9:15-CV-1233 (GTS/DEP)
                                          (MEMBER CASE)

v.

CRAIG DEMMON, *et al.*,

          Defendants.
_____

JONATHAN HINES, *et al.*,

          Plaintiffs,                  9:16-CV-0061 (GTS/DEP)
                                          (MEMBER CASE)

v.

CRAIG DEMMON, *et al.*,

          Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

LAW OFFICES OF ELMER R. KEACH            ELMER R. KEACH, III, ESQ.
  Plaintiffs, *Pro Se*                        MARIA K. DYSON, ESQ.
One Pine West Plaza, Suite 109
Albany, New York 12205

HON. ERIC T. SCHNEIDERMAN               TIMOTHY P. MULVEY, ESQ.
Attorney General for the State of New York      Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, New York 12224

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in these consolidated prisoner civil rights actions filed by ten inmates ("Plaintiffs") against ten individuals employed by the New York State Department of Corrections and Community Supervision at Bare Hill Correctional Facility in Malone, New York, is a motion for partial summary judgment filed by Corrections Officer David Hughes and Corrections Lieutenant Terrence White ("Defendants"). (Dkt. No. 39.) For the reasons set forth below, Defendants' motion is denied with regard to Plaintiffs' claim against Defendant Hughes but granted with regard to Plaintiffs' claim against Defendant White.

I.     **RELEVANT BACKGROUND**

   A.     **Plaintiffs' Complaints**

Generally, Plaintiffs' Complaints allege, *inter alia*, that Defendant Hughes subjected Plaintiffs to cruel and unusual punishment under the Eighth Amendment when, on February 7, 2013, he assisted other correctional officers in recklessly requiring Plaintiffs to take off their gloves and place their bare hands on a metal fence in freezing temperature for approximately thirty minutes until one of them came forward with information regarding an altercation that had

occurred between inmates (under the pretext of subjecting the inmates to a pat-frisk), causing them to suffer severe frostbite and nerve damage. The Complaints further allege, *inter alia*, that Defendant Terry is liable under the Eighth Amendment because, after being informed of the constitutional violation through Plaintiffs' grievances, he failed to remedy the violation, but rather categorically denied the grievances on the ground that Plaintiffs should have worn their gloves (despite their allegation that they were forced to remove their gloves), thus deeming Hughes' conduct to be appropriate and ratifying it.

Because this Decision and Order is intended primarily for the review of the parties, the Court will assume the reader's familiarity with particular nature of the Complaints' claims and supporting factual allegations, and will respectfully refer the reader to Part I.B. of the Court's Decision and Order of August 5, 2015, in *Pierce v. Demmon*, 14-CV-1028 (N.D.N.Y.) (Suddaby, J.), which accurately summarizes those claims and allegations.

**B.      Parties' Briefing on Defendants' Motion**

Generally, in their memorandum of law, Defendants assert two arguments: (1) based on the current record, no reasonable jury could conclude that Defendant Hughes subjected Plaintiffs to cruel and unusual punishment, because, *inter alia*, (a) he did not give any direct orders to Plaintiffs regarding the pat-frisks, (b) he was 50 to 70 yards away from the inmates while they were pat-frisked by other corrections officers, (c) the extent of his personal involvement in the pat-frisks was returning with the inmates' identification cards (after compiling a list of the inmates assembled) and assisting with one or two final pat-frisks, and (d) there is no claim that Defendant Hughes failed to intervene in the cruel and unusual punishment allegedly inflicted by other corrections officers; and (2) based on the current record, Defendant White is protected

from liability as a matter of law by the doctrine of qualified immunity, because (a) during the time in question, it was not clearly established (i.e., with reasonable clarity by either the Supreme Court or Second Circuit) that a supervisor is liable for investigating and denying a grievance regarding an assault in which the supervisor was not personally involved, and (b) there is no objective evidence that White had any reason to believe that his investigation violated clearly established law or that he acted with malice or bad faith in denying Plaintiffs' grievances. (Dkt. No. 39, Attach. 14.)

Generally, in their opposition memorandum of law, Plaintiffs assert two arguments: (1) Plaintiffs' claim against Defendant Hughes should not be dismissed because (a) Hughes admits that he saw inmates with their ungloved hands on the fence, (b) his testimony that he did not hear any inmates complain while on the fence is undermined by admissible record evidence that inmates, including Plaintiffs, were complaining during the time in question, (c) he admits he was involved in at least some of the pat-frisks on the evening in question, and (d) Defendants Demmon, Hough and LaBarge admitted that Hughes was involved in the pat-frisks in question; and (2) a jury should decide whether Defendant White is entitled to qualified immunity, because (a) the law conferring liability on a supervisor for reviewing and denying a grievance is clearly established, as previously recognized by the Court in Part IV.A.1. of its Decision and Order of August 5, 2015, in *Pierce v. Demmon*, 14-CV-1028 (N.D.N.Y.) (Suddaby, J.), and (b) Defendants have not met their burden of establishing that White's actions were objectively reasonable, given the lack of documents evidencing that some of the inmates told White they did not have gloves, the fact that Plaintiffs will be entitled to a spoliation instruction regarding missing documents and video footage, and the undisputed fact that all of the inmates were required to remove their gloves.  (Dkt. No. 45, Attach. 23.)

Generally, in their reply memorandum of law, Defendants assert two arguments: (1) contrary to arguing that Defendant Hughes did not participate in any of the pat-frisks during the evening in question, Defendants argue that Hughes' participation was limited to possibly participating in two or three pat-frisks at the conclusion of the incident, which pat-frisks may not have been of Plaintiffs (who were only 50% of the 20 inmates assembled that evening), and which participation in any event is so *de minimis* as to be insufficient to confer on him liability under the Eighth Amendment; and (2) contrary to Plaintiffs' argument, during the time in question there was no clearly established law conferring liability on a supervisor for investigating and denying grievances related to events that the supervisor could not have remedied (because those events were no longer ongoing at the time of the investigation and denial). (Dkt. No. 47.)

## C. Statement of Undisputed Material Facts

Generally, unless otherwise noted, the following facts were asserted and supported by Defendants in their Rule 7.1 Statement and admitted by Plaintiffs in their Rule 7.1 Response.

<u>Events Regarding Defendant Hughes</u>

1. On February 7, 2013, all of the Plaintiffs in the lead case, and all the Plaintiffs in the member cases, were inmates in the custody of the New York State Department of Corrections and Community Supervision at Bare Hill Correctional Facility ("Bare Hill C.F.") in Malone, New York.

2. In February of 2013, Defendant David Hughes was a corrections officer at Bare Hill C.F.

3. Also in February of 2013, Defendant Terrence White was a corrections lieutenant at Bare Hill C.F.

4.      On the evening of February 7, 2013, it was approximately zero degrees Fahrenheit at Bare Hill C.F.[1]

5.      On that same evening, Defendant Hughes was assigned to man the "J-Rec" guard shack "J-Rec shack"), which is located adjacent to the walkway (i.e., sidewalk) that parallels the road leading from the "main" portion of Bare Hill C.F. to the Bare Hill C.F. "Annex."

6.      Also on that evening, Defendant Hughes observed an inmate step off the walkway and come toward the J-Rec shack.

7.      According to Defendant Hughes, the inmate had sustained "a big gaping cut on his face."

8.      Once Defendant Hughes had ascertained that the injured inmate had been assaulted, Defendant Hughes called for assistance and had all movement within the facility stopped.

9.      A few minutes after Defendant Hughes reported that an inmate had been assaulted in the vicinity of the J-Rec shack, Sgt. Craig Demmon arrived at that location.

10.     Upon Sgt. Demmon's arrival, Defendant Hughes collected identification cards from the inmates who had been assembled along the Bare Hill C.F. recreation yard perimeter fence, in the area adjacent to the "compound gate," leading to the Bare Hill C.F. Annex.[2]

---

[1]      *See Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit'"); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed'").

[2]      *See, supra,* note 1 of this Decision and Order.

11.     Defendant Hughes estimates there were approximately twenty (20) inmates assembled along the Bare Hill C.F. recreation yard perimeter fence.[3]

12.     The lead Plaintiff, Jamal Bertrand, also estimated there were 20 inmates stopped and pat-frisked on the evening in question.

13.     According to Defendant Hughes, while the inmates were being assembled along the Bare Hill C.F. recreation yard perimeter fence on the night in question, Defendant Hughes did not hear any initial instructions being given to the inmates by Sgt. Demon, or Corrections Officers Hough and LaBarge, who were also present.

14.     After collecting the inmates' identification cards, Defendant Hughes returned to his post in the J-Rec Shack, which he approximates is about 50 to 70 yards from where the inmates were being assembled along the Bare Hill C.F. recreation yard perimeter fence.

15.     After returning to his J-Rec shack, Defendant Hughes observed some of the assembled inmates being pat-frisked from the shack, 50 to 70 yards away.[4]

16.     While in the J-Rec shack, Defendant Hughes compiled a list of the inmates assembled along the Bare Hill C.F. recreation yard perimeter fence.[5]

17.     According to Defendant Hughes, it took him approximately 10 minutes to compile the list of inmates being pat-frisked.

18.     Upon completing the list of inmates being detained near the compound gate, Defendant Hughes left the J-Rec shack, and returned to the area where the inmates were being pat-frisked.

---

[3]     *See, supra,* note 1 of this Decision and Order.

[4]     (*Compare* Dkt. No. 39, Attach. 13, at ¶ 15 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 45, Attach. 22, at ¶ 15 [Plfs.' Rule 7.1 Response].)

[5]     *See, supra,* note 1 of this Decision and Order.

19.     When he returned to the compound gate area, Defendant Hughes observed inmates lined up against the main recreation yard fence being pat-frisked.[6]

20.     According to Defendant Hughes, he pat-frisked only "two to three [inmates] at the most."

21.     According to Defendant Hughes, he did not hear any inmates complain about the cold or pain in their hands.[7]

22.     After the pat-frisks were completed, the inmates were directed to line up to go through the compound gate metal detector.

23.     According to Defendant Hughes, he spent only five to six minutes pat-frisking the inmates.[8]

24.     According to Defendant Hughes, he was "absent from the vicinity of the [pat-frisks of inmates by Officers LaBarge and Hough] for much of the time [the pat-frisks] went on."

25.     As conceded by Plaintiffs (through their counsel during a deposition), Defendant Hughes is a "person who is not out to inflict pain on people . . . just gratuitously . . . ."[9]

---

[6]     (*Compare* Dkt. No. 39, Attach. 13, at ¶ 19 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 45, Attach. 22, at ¶ 19 [Plfs.' Rule 7.1 Response, denying fact but failing to support denial with citation to record evidence that actually controverts fact].)

[7]     (*Compare* Dkt. No. 39, Attach. 13, at ¶ 21 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 45, Attach. 22, at ¶ 21 [Plfs.' Rule 7.1 Response].)

[8]     (*Compare* Dkt. No. 39, Attach. 13, at ¶ 23 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 45, Attach. 22, at ¶ 23 [Plfs.' Rule 7.1 Response].)

[9]     *See United States Trust Co. v. Shapiro*, 835 F.2d 1007, 1008 (2d Cir.1987) (holding that a party is bound by the non-gratuitous concessions of its counsel). The Court notes that, in arguing that the concession by Plaintiffs' counsel was merely a "colloquy," Plaintiffs' counsel ignores the fact that he deliberately made the concession in an attempt to persuade a witness to admit under oath that (1) the witness had a mantra that he would show respect to an inmate who had shown him respect, and (2) the witness had seen other corrections officers who did not have that mantra. (Dkt. No. 45, Attach. 3, at 35-36 [Hughes Depo. Tr.].)

Events Regarding Defendant White

26.     On February 12, 2013, Plaintiff Alexander Santos filed Bare Hill C.F. Grievance No. 12988 alleging staff misconduct and abuse on February 7, 2013, which resulted in his suffering frostbite injuries.

27.     On February 12, 2013, Plaintiff Jose Salas filed Bare Hill C.F. Grievance No. 13011 alleging staff misconduct and abuse on February 7, 2013, which resulted in his suffering frostbite injuries.

28.     On February 13, 2013, Plaintiff Elisha Jackson filed Bare Hill C.F. Grievance No. 12989 alleging staff misconduct and abuse on February 7, 2013, which resulted in his suffering frostbite injuries.

29.     On February 14, 2013, Plaintiff Shane Gordon filed Bare Hill C.F. Grievance No. 12999 alleging staff misconduct and abuse on February 7, 2013, which resulted in his suffering frostbite injuries.

30.     On February 14, 2013, Plaintiff Laquan Thompson filed Bare Hill C.F. Grievance No. 12997 alleging staff misconduct and abuse on February 7, 2013, which resulted in his suffering frostbite injuries.

31.     On February 14, 2013, Plaintiff Rashid Evans filed Bare Hill C.F. Grievance No. 12998 alleging staff misconduct and abuse on February 7, 2013, which resulted in his suffering frostbite injuries.

32.     On February 19, 2013, Plaintiff Jamal Bertrand filed Bare Hill C.F. Grievance No. 13003 alleging staff misconduct and abuse on February 7, 2013, which resulted in his suffering frostbite injuries.

33.     On February 19, 2013, Plaintiff Jamel Weaver filed Bare Hill C.F. Grievance No. 13000 alleging staff misconduct and abuse on February 7, 2013, which resulted in his suffering frostbite injuries.

34.     On February 19, 2013, Plaintiff Jonathan Hines filed Bare Hill C.F. Grievance No.13004 alleging staff misconduct and abuse on February 7, 2013, which resulted in his suffering frost bite injuries.

35.     Corrections Lt. Terrence White was not at Bare Hill C.F. when Plaintiffs were being pat-frisked near the annex gate on the evening of February 7, 2013.

36.     After he came on duty the evening of February 7, 2013, Defendant White was made aware of the assault and subsequent pat-frisks that took place before he arrived at Bare Hill C.F. earlier in the day.

37.     On or about the period February 13 through February 20, 2013, Defendant White was assigned, by Corrections Captain Gallagher, to investigate the events of February 7, 2013, including Plaintiffs' grievances related to the events on that evening.[10]

38.     On February 18, 2013, Defendant White submitted his report to Captain Gallagher, from his investigation of Plaintiff Santos' inmate grievance concerning the events of February 7, 2013, at Bare Hill C.F.; Defendant White recommended that the grievance be denied.

39.     On February 18, 2013, Defendant White submitted his report to Captain Gallagher, from his investigation of Plaintiff Elisha Jackson's inmate grievance concerning the events of February 7, 2013, at Bare Hill C.F.; Defendant White recommended that the grievance be denied.

---

[10]     *See, supra,* note 1 of this Decision and Order.          .

40.     On February 18, 2013, Defendant White submitted his report to Captain Gallagher, from his investigation of Plaintiff Gordon's inmate grievance concerning the events of February 7, 2013, at Bare Hill C.F.; Defendant White recommended that the grievance be denied.

41.     On February 18, 2013, Defendant White submitted his report to Captain Gallagher, from his investigation of Plaintiff Thompson's inmate grievance concerning the events of February 7, 2013, at Bare Hill C.F.; Defendant White recommended that the grievance be denied.

42.     On February 18, 2013, Defendant White submitted his report to Captain Gallagher, from his investigation of Plaintiff Evans' inmate grievance concerning the events of February 7, 2013, at Bare Hill C.F.; Defendant White recommended that the grievance be denied.

43.     On February 23, 2013, Defendant White submitted his report to Captain Gallagher, from his investigation of Plaintiff Hines; inmate grievance concerning the events of February 7, 2013, at Bare Hill C.F.; Defendant White recommended that the grievance be denied.

44.     On February 23, 2013, Defendant White submitted his report to Captain Gallagher, from his investigation of Plaintiff Bertrand's inmate grievance concerning the events of February 7, 2013, at Bare Hill C.F.; Defendant White recommended that the grievance be denied.

45.     On February 25, 2013, Defendant White submitted his report to Captain Gallagher, from his investigation of Plaintiff Weaver's inmate grievance concerning the events of February 7, 2013, at Bare Hill C.F.; Defendant White recommended that the grievance be denied.

46.     On February 26, 2013, Defendant White submitted his report to Captain Gallagher, from his investigation of Plaintiff Santos' inmate grievance concerning the events of February 7, 2013, at Bare Hill C.F.; Defendant White recommended that the grievance be denied.

47.     Defendant White was not present during the pat-frisks and has no personal knowledge whether the inmates were ordered to grasp the metal main yard fence, with their bare hands, for the entire time the pat-frisks were being conducted.

48.     Based on his interviews with the inmates, Defendant White did not believe the inmates' claims that their hands were against the fence for the whole time the incident was taking place and that they were not allowed to put their hats and gloves back on.[11]

49.     In Defendant White's opinion, Plaintiffs were not properly dressed for the very cold weather conditions on the night in question.

## II.     GOVERNING LEGAL STANDARDS

### A.     Standard Governing Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v.*

---

[11]     (*Compare* Dkt. No. 39, Attach. 13, at ¶ 48 [Defs.' Rule 7.1 Statement, citing page 64 of Def. White's Depo. Tr., in which he answers "Yes . . . [b]ased on my interviews with the inmates" to the question, "Would you agree with me that for the inmates who told you that their hands were against the fence for a period of time [i.e., the whole time this incident was taking place] and they weren't allowed to put their hats and gloves on that you disbelieve[d] what they were telling you?"] *with* Dkt. No. 45, Attach. 22, at ¶ 48 [Plfs.' Rule 7.1 Response].)

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[12]  As for the materiality requirement, a dispute of

fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual

disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of the . . . [record] which it believes

demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S.

317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must

come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ.

P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant

willfully fails to respond to a motion for summary judgment, a district court has no duty to

perform an independent review of the record to find proof of a factual dispute.[13]  Of course,

when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that

there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be

granted automatically."  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as

indicated above, the Court must assure itself that, based on the undisputed material facts, the law

---

[12]       As a result, "[c]onclusory allegations, conjecture and speculation . . . are
insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir.
1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more
than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita
Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[13]       *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.)
(citing cases).

indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[14]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[15] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested

---

[14]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[15]     *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

**B.      Standard Governing Claim of Cruel and Unusual Punishment**

Because the parties have (in their memoranda of law) already demonstrated an adequate understanding of the legal standard governing Plaintiffs' claims of cruel and unusual punishment and supervisory liability, the Court will not recite in detail those standards in this Decision and Order, which is intended primarily for the review of the parties.

**III.   ANALYSIS**

After carefully considering the matter, the Court denies Defendants' motion with regard to Plaintiffs' claim against Defendant Hughes for the reasons stated in Plaintiffs' opposition memorandum of law, but grants Defendants' motion with regard to Plaintiffs' claim against Defendant White for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.B. of this Decision and Order. To those reasons, the Court adds the following analysis.

Regarding Plaintiffs' claim against Defendant Hughes, the Court finds that admissible record evidence exists from which a rational fact-finder could conclude that (1) Hughes was conducting pat-frisks when Defendants Hough and LaBarge arrived,[16] (2) Hughes was among the corrections officers who ordered the inmates to place their ungloved hands on the fence,[17] (3) after Hughes returned from the J-Rec shack, he spent five or six minutes pat-frisking two or three

---

[16]      (Dkt. No. 45, Attach. 4, at 18-19 [Hough Depo. Tr.]; Dkt. No. 45, Attach. 5, at 25-26 [LaBarge Depo. Tr.]; *cf.* Dkt. No. 45, Attach. 1, at 52-53, 66 [Demmon Depo. Tr.].)

[17]      (Dkt. No. 45, Attach. 1, at 52-53 [Demmon Depo. Tr.].)

inmates,[18] (4) while Hughes was present at the scene of the pat-frisks, he saw inmates with their

ungloved hands on the fence,[19] and (5) although Hughes testified that he did not hear any inmates

complain while on the fence, inmates (including Plaintiffs) did complain.[20]  The Court notes that,

while Plaintiffs have conceded that Defendant Hughes is a "person who is not out to inflict pain

on people . . . just gratuitously" (i.e., without *any* cause), a reasonable jury could still conclude

from the evidence that Hughes inflicted pain on Plaintiffs without *just* cause (i.e., sufficient to

make his conduct malicious for purposes of the Eighth Amendment).

Regarding Plaintiffs' claim against Defendant White, the Court begins by finding that the

Court's prior ruling does not compel its current ruling because the Court's prior ruling regarded

whether Defendant White was personally involvement in the constitutional violation alleged

pursuant to the standard set forth in Fed. R. Civ. P. 12(b)(6), while the Court's current ruling

regards whether Defendant White is protected from liability as a matter of law by the doctrine of

qualified immunity pursuant to the standard set forth in Fed. R. Civ. P. 56.  The difference

between a finding of personal involvement and a finding of qualified immunity is significant,

because the former does not preclude the latter.[21]  Moreover, the difference between the

---

[18]     (Dkt. No. 45, Attach. 3, at 8-9 [Hughes Depo. Tr.].)

[19]     (Dkt. No. 45, Attach. 3, at 12-13 [Hughes Depo. Tr.].)

[20]     (Dkt. No. 45, Attach. 2, at 45 [Gordon Depo. Tr.]; Dkt. No. 45, Attach. 8, at 31 [Thompson Depo. Tr.]; cf. Dkt. No. 45, Attach. 7, at 50-51 [Santos Depo. Tr.].)

[21]     *See Brown v. Coughlin*, 704 F. Supp. 41 (S.D.N.Y. 1989) ("Despite their personal involvement in the alleged constitutional violation, the defendants can escape liability if they enjoy absolute or qualified immunity."); *see, e.g., White v. Fisher*, 09-CV-0240, 2010 WL 624081, at *9 (N.D.N.Y. Feb. 18, 2010) (Peebles, M.J.) ("[P]laintiff has sufficiently alleged personal involvement on the part of defendant Knapp-David and R. Woods. Nonetheless, I find that those two defendants are entitled to qualified immunity from suit . . . ."); *cf. Hall v. Marshall*, 479 F. Supp.2d 304, 315, n.3 (E.D.N.Y. 2007) ("Since Marshall's lack of personal involvement precludes Hall's claim against him regarding the PSR, the Court need not decide whether Marshall would be protected by either absolute or qualified immunity.").

documents considered on a motion under Fed. R. Civ. 12(b)(6) and a motion under Fed. R. Civ.

P. 56 is also significant: the relevant portion of the Court's Decision and Order of August 5,

2015, relied on an investigative report of February 18, 2013, from Defendant White regarding a

grievance from Inmate Gordon,[22] while the relevant portion of the Court's current Decision and

Order relies on many more documents.[23]

_____

[22]     *Pierce v. Demmon*, 14-CV-1028, Decision and Order, at 18, n.4 (N.D.N.Y. filed Feb. 17, 2013) (Suddaby, J.)

[23]     Specifically, the relevant portion of the Court's current Decision and Order relies on, *inter alia*, the following: (1) an email message of February 13, 2013, from Captain Boyd to Defendant White regarding Inmate Santos' medical condition (Dkt. No. 39, Attach. 3, at 3); (2) an investigative report of February 18, 2013, from Defendant White regarding the grievance of Inmate Santos (Dkt. No. 39, Attach. 3, at 5-6); (3) a grievance of February 8, 2013, from Inmate Santos (Dkt. No. 39, Attach. 3, at 8); (4) a memorandum of February 16, 2013, from Defendant Demmon to Defendant White regarding the incident (Dkt. No. 39, Attach. 3, at 13); (5) a memorandum of February 18, 2013, from Corrections Officer R. Belrose to Defendant White regarding the incident (Dkt. No. 39, Attach. 3, at 15); (6) a memorandum of February 18, 2013, from Corrections Officer Rock to Defendant White regarding the incident (Dkt. No. 39, Attach. 3, at 16); (7) a memorandum of February 7, 2013, from Defendant Hough to Defendant White regarding the incident (Dkt. No. 39, Attach. 3, at 17); (8) a memorandum of February 7, 2013, from Corrections Officer J. Rolland to Defendant White regarding the incident (Dkt. No. 39, Attach. 3, at 18); (9) a memorandum of February 12, 2013, from Defendant Hughes to Defendant White regarding the incident (Dkt. No. 39, Attach. 3, at 19); (10) a memorandum of February 20, 2013, from Defendant LaBarge to Defendant White regarding the incident (Dkt. No. 39, Attach. 3, at 20); (11) a grievance of February 20, 2013, from Inmate Salas (Dkt. No. 39, Attach. 4, at 4); (12) an investigative report of February 26, 2013, from Defendant White regarding the grievance of Inmate Salas (Dkt. No. 39, Attach. 4, at 5-6); (13) an investigative report of February 18, 2013, from Defendant White regarding the grievance of Inmate Jackson (Dkt. No. 39, Attach. 5, at 5-6); (14) an email message of February 13, 2013, from Captain Boyd to Defendant White regarding Plaintiff Jackson's medical condition (Dkt. No. 39, Attach. 5, at 7); (15) a grievance from Inmate Jackson (Dkt. No. 39, Attach. 5, at 19-20); (16) a grievance of February 14, 2013, from Inmate Gordon (Dkt. No. 39, Attach. 6, at 5-6); (17) an email message of February 20, 2013, from Captain Boyd to Defendant White regarding Inmate Gordon's medical condition (Dkt. No. 39, Attach. 6, at 8); (18) a grievance of February 14, 2013, from Inmate Thompson (Dkt. No. 39, Attach. 7, at 2); (19) an email message of February 20, 2013, from Captain Boyd to Defendant White regarding Inmate Thompson's medical condition (Dkt. No. 39, Attach. 7, at 3); (20) an investigative report of February 18, 2013, from Defendant White regarding the grievance of Inmate Thompson (Dkt. No. 39, Attach. 7, at 5-6); (21) an investigative report of February 18, 2013, from Defendant White regarding the grievance of Inmate Evans (Dkt. No. 39, Attach. 8, at 4-5); (22) an email message of February 20, 2013, from Captain Boyd to Defendant White regarding Inmate Evan' medical condition (Dkt. No. 39, Attach. 8, at 6); (23) a grievance from

The Court also finds merit to each of the alternative qualified-immunity arguments advanced by Defendants: (1) as a threshold matter, regardless of how the Court previously resolved the close question of Defendant White's personal involvement in the constitutional violation alleged, the Court now finds that, in February of 2013, it was not clearly established that a supervisor could be liable for failing to remedy a violation that was no longer occurring (after being informed it through a grievance);[24] and (2) in any event, the Court finds that Defendants have met their burden of establishing, as a matter of law, that officers of reasonable competence could disagree on the legality of Defendant White's denials of the inmates' grievances based on the information before him, which included (a) corrections officers' written

_____

Inmate Evans (Dkt. No. 39, Attach. 8, at 16-17); (24) an investigative report of February 25, 2013, from Defendant White regarding the grievance of Inmate Bertrand (Dkt. No. 39, Attach. 9, at 4-5); (25) a grievance of February 19, 2013, from Inmate Bertrand (Dkt. No. 39, Attach. 9, at 15-16); (26) an investigative report of February 25, 2013, from Defendant White regarding the grievance of Inmate Weaver (Dkt. No. 39, Attach. 10, at 14-15); (27) a grievance of February 15, 2013, from Inmate Weaver (Dkt. No. 39, Attach. 10, at 16-17); (28) an investigative report of February 23, 2013, from Defendant White regarding the grievance of Inmate Hines (Dkt. No. 39, Attach. 11, at 5-6); (29) a grievance of February 19, 2013, from Inmate Hines (Dkt. No. 39, Attach. 11, at 18-19); and (30) a transcript of the deposition of Defendant White (Dkt. No. 39, Attach. 12).

[24]    *See, e.g., Brooks v. Hogan,* 14-CV-0477, 2016 WL 1298137, at *5 (N.D.N.Y. March 31, 2016) (Kahn, J.) ("Because Plaintiff's grievance related to conduct that was not ongoing, Gonzalez, Nowicki, and Hogan's review of that grievance is not sufficient to establish those officials' personal involvement."); *Guillory v. Weber*, 12-CV-0280, 2015 WL 1419088, at *11 (N.D.N.Y. Mar. 27, 2015) (Treece, M.J.) ("Whether a supervisory official can be liable under the second Colon factor–failing to remedy a wrong after learning of the violation–appears to turn on whether the complaint alleges an 'ongoing' constitutional violation."); *Smith v. Wildermuth*, 11-CV-0241, 2013 WL 877399, at *9 (N.D.N.Y. Jan. 24, 2013) (Dancks, M.J.) ("The second Colon category–that a supervisor is personally involved if he or she failed to remedy a violation after learning of it through a report or appeal-applies only to situations where an alleged violation is ongoing, not to situations involving a one–time violation."); *Vega v. Artus,* 610 F. Supp.2d 185  (N.D.N.Y. 2009) (Suddaby, J.) ("Since Defendant Artus was presented with a grievance in which the alleged misconduct had ceased, Defendant Artus cannot be found to be personally involved for failing to remedy that misconduct."); *Harnett v. Barr*, 538 F. Supp.2d 511, 524 (N.D.N.Y. March 7, 2008) (Hurd, J.) ("If the official is confronted with a violation that has already occurred and is not ongoing, then the official will  not be found personally responsible for failing to 'remedy' a violation.").

denials of any mistreatment or unprofessional conduct,[25] (b) inmates' statements during

interviews undermining if not directly contradicting their claims that, after an inspection, they

were not allowed to put on gloves in their possession,[26] (c) inmates' package and commissary

---

[25]    (Dkt. No. 39, Attach. 3, at 15 [memo. of Feb. 18, 2013, from Belrose to White denying any harassment or unprofessional conduct]; Dkt. No. 39, Attach. 3, at 16 [memo. of Feb. 18, 2013, from Rock to White denying any unprofessional conduct or mistreatment]; Dkt. No. 39, Attach. 3, at 17 [memo. of Feb. 7, 2013, from Hough to White denying any mistreatment]; Dkt. No. 39, Attach. 3, at 18 [memo. of Feb. 7, 2013, from Rolland to White denying any mistreatment]; Dkt. No. 39, Attach. 3, at 19 [memo. of Feb. 12, 2013, from Hughes to White denying any physically abusive or unprofessional conduct]; Dkt. No. 39, Attach. 3, at 20 [memo. of Feb. 20, 2013, from LaBarge to White any unprofessional conduct or mistreatment].)

[26]    (Dkt. No. 45, Attach. 10, at 64 [White Depo. Tr., in which White testified that he did not believe the inmates' claims that their hands were against the fence for the whole time the incident was taking place and that they were not allowed to put their hats and gloves back on, "[b]ased on my interviews with the inmates"]; Dkt. No. 39, Attach. 3, at 5-6 [investigative report of Feb. 18, 2013, from White regarding his interview of Inmate Santos, relaying Santos' statement that he did not have gloves with him at the time of the incident because "I chose not to buy them"]; Dkt. No. 39, Attach. 4, at 5-6 [investigative report of Feb. 26, 2013, from White regarding his interview of Inmate Salas, relaying Salas' statement that he did not have gloves with him at the time of the incident]; Dkt. No. 39, Attach. 5, at 5-6 [investigative report of Feb. 18, 2013, from White regarding his interview of Inmate Jackson, relaying Jackson's admission that, contrary to what he had just said, he did not in fact have any gloves with him at the time of the incident]; Dkt. No. 39, Attach. 7, at 5-6 [investigative report of Feb. 18, 2013, from White regarding his interview of Inmate Thompson, relaying Thompson's refusal to provide the name of the other inmate from whom he had allegedly borrowed gloves on the night on question]; Dkt. No. 39, Attach. 8, at 4-5 [investigative report of Feb. 18, 2013, from White regarding his interview of Inmate Evans, relaying Evans' statements that he did not have gloves with him at the time of the incident, and that those inmates who did have gloves were allowed to put them back on after an inspection of them]; Dkt. No. 39, Attach. 9, at 4-5 [investigative report of Feb. 25, 2013, from White regarding his interview of Inmate Bertrand, relaying Bertrand's admission that, contrary to what he had just said, he did not in fact have any gloves with him at the time of the incident]; Dkt. No. 39, Attach. 10, at 14-15 [investigative report of Feb. 25, 2013, from White regarding his interview of Inmate Weaver, relaying Weaver's statement that he did not have gloves with him at the time of the incident]; Dkt. No. 39, Attach. 11, at 5-6 [investigative report of Feb. 23, 2013, from White regarding his interview of Inmate Hines, relaying Hines' inability to provide the name or location of the other inmate from whom he had allegedly borrowed gloves on the night on question].)

receipts indicating that certain inmates did not have gloves with them at the time in question,[27]

and (d) prison logbooks and records indicating that, at most, the inmates spent 12 to 15 minutes

with their bare hands on the fence.[28]

---

[27]     (Dkt. No. 39, Attach. 4, at 5-6 [investigative report of Feb. 26, 2013, from White regarding his interview of Inmate Salas, relaying the fact that Salas' package and commissary receipts reflect that he did not have gloves on the night of the incident]; Dkt. No. 39, Attach. 5, at 5-6 [investigative report of Feb. 18, 2013, from White regarding his interview of Inmate Jackson, relaying the fact that Jackson's package and commissary receipts reflect that he did not have gloves on the night of the incident]; Dkt. No. 39, Attach. 9, at 4-5 [investigative report of Feb. 25, 2013, from White regarding his interview of Inmate Bertrand, relaying the fact that Bertrand's package and commissary receipts reflect that he did not have gloves on the night of the incident]; Dkt. No. 39, Attach. 11, at 5-6 [investigative report of Feb. 23, 2013, from White regarding his interview of Inmate Hines, relaying the fact that Hines' package and commissary receipts reflect that he did not have gloves on the night of the incident].)

[28]     (Dkt. No. 39, Attach. 3, at 5-6 [investigative report of Feb. 18, 2013, from White regarding his interview of Inmate Santos, relaying the fact that prison logbooks and records indicate that, at most, the inmates' time of the fence lasted 12 to 15 minutes]; Dkt. No. 39, Attach. 4, at 5-6 [investigative report of Feb. 26, 2013, from White regarding his interview of Inmate Salas, relaying the fact that prison logbooks and records indicate that, at most, the inmates' time of the fence lasted 12 to 15 minutes]; Dkt. No. 39, Attach. 5, at 5-6 [investigative report of Feb. 18, 2013, from White regarding his interview of Inmate Jackson, relaying the fact that prison logbooks and records indicate that, at most, the inmates' time of the fence lasted 12 to 15 minutes]; Dkt. No. 39, Attach. 7, at 5-6 [investigative report of Feb. 18, 2013, from White regarding his interview of Inmate Thompson, relaying the fact that prison logbooks and records indicate that, at most, the inmates' time of the fence lasted 12 to 15 minutes]; Dkt. No. 39, Attach. 8, at 4-5 [investigative report of Feb. 18, 2013, from White regarding his interview of Inmate Evans, relaying the fact that prison logbooks and records indicate that, at most, the inmates' time of the fence lasted 12 to 15 minutes]; Dkt. No. 39, Attach. 9, at 4-5 [investigative report of Feb. 25, 2013, from White regarding his interview of Inmate Bertrand, relaying the fact that prison logbooks and records indicate that, at most, the inmates' time of the fence lasted 12 to 15 minutes]; Dkt. No. 39, Attach. 10, at 14-15 [investigative report of Feb. 25, 2013, from White regarding his interview of Inmate Weaver, relaying the fact that prison logbooks and records indicate that, at most, the inmates' time of the fence lasted 12 to 15 minutes]; Dkt. No. 39, Attach. 11, at 5-6 [investigative report of Feb. 23, 2013, from White regarding his interview of Inmate Hines, relaying the fact that prison logbooks and records indicate that, at most, the inmates' time of the fence lasted 12 to 15 minutes].)

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 39) is **<u>DENIED</u>** with regard to Plaintiffs' claim against Defendant Hughes, but **<u>GRANTED</u>** with regard to Plaintiffs' claim against Defendant White; and it is further

**ORDERED** that Plaintiffs' claim against Defendant White is **<u>DISMISSED</u>**; and it is further

**ORDERED** that, **SURVIVING** Defendants' motion for partial summary judgment are the following claims:

      (1) a claim of cruel-and-unusual punishment under the Eighth Amendment asserted by all Plaintiffs (i.e., Jamal Bertrand, Laqwan Thompson, Rashid Evans, Alexander Santos, Jr., Jamel Weaver, Davon Jackson, Shane Gordon, Jose Salas, Elisha Jackson and Jonathan Hines) against Defendants Craig Demmon, D. Hughes, G. LaBarge and S. Hough;

      (2) a claim of cruel-and-unusual punishment under the Eighth Amendment asserted by all Plaintiffs except Jonathan Hines (i.e., Jamal Bertrand, Laqwan Thompson, Rashid Evans, Alexander Santos, Jr., Jamel Weaver, Davon Jackson, Shane Gordon, Jose Salas and Elisha Jackson) against Defendants John Doe 1-4;

      (3) a claim of supervisory liability under the Eighth Amendment asserted by all Plaintiffs (i.e., Jamal Bertrand, Laqwan Thompson, Rashid Evans, Alexander Santos, Jr., Jamel Weaver, Davon Jackson, Shane Gordon, Jose Salas, Elisha Jackson and Jonathan Hines) against Defendant Craig Demmon; and

      (4) a claim of supervisory liability under the Eighth Amendment asserted by all Plaintiffs except Shane Gordon, Jose Salas, Elisha Jackson and Jonathan

Hines (i.e., Jamal Bertrand, Laqwan Thompson, Rashid Evans, Alexander Santos, Jr., Jamel Weaver and Davon Jackson) against Defendant Bruce Yellich; and it is further

**ORDERED** that Plaintiffs shall **SHOW CAUSE**, within **FOURTEEN (14) DAYS** of the date of this Decision and Order, why their claims against Defendants John Doe 1-4 should not be *sua sponte* **<u>DISMISSED</u> without prejudice** for failure to (name and) serve those Defendants pursuant to Fed. R. Civ. P. 4(m); and it is further

**ORDERED** that counsel are directed to appear on December 13, 2016 at 11:00 a.m. in Syracuse, NY for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than NOVEMBER 18, 2016, and the parties are directed to engage in meaningful settlement negotiations prior to the conference. In the event that counsel feel settlement is unlikely, counsel may request to participate via telephone conference for the limited purpose of scheduling a trial date by electronically filing a letter request at least one week prior to the scheduled conference.

Dated: October 25, 2016
      Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge